Our third argument of the morning is in Appeal No. 24-1751, Waukegan Potawatomi Casino v. City of Waukegan. Good morning Mr. Smith. Good morning, Judge Sutter. May it please the Court, Dylan Smith for Waukegan Potawatomi Casino, which I'll be referring to throughout my argument as Potawatomi to keep things simple. And if I may, I propose to take things out of order and begin with the merits of Potawatomi's And I want to do that in part because once this case was removed to federal court, I was the lawyer who was principally responsible for litigating it below, and so I'm familiar with the record, which I think is a little more important for that claim. If time does not permit us to get back to the Section 1983 claim, as you've seen from our papers, we do believe that the district court's analysis is flawed in multiple respects, but we are comfortable resting on the papers if that's where we end up. Let me just say at the outset on the equal protection claim, I don't believe that there's a significant dispute between the parties about the standard that governs Class of 1 claims generally. Where the district court went astray here, the fundamental problem with its analysis is the failure to identify the discriminatory conduct at issue and apply that standard to that conduct as framed by Potawatomi and the evidence in the summary judgment record. Before we get to the discriminatory conduct, there's a hurdle to get through, and that's the similarly situated, which is very important in Class of 1 claims for obvious reasons, and we have said you have to be identical in all relevant respects or directly comparable in all material respects. How was your client similarly situated here? How were the proposals submitted by it? Thanks, Judge Saini. The key term there is in all relevant respects, and when I put the focus on the need to identify the discriminatory conduct, that's important for both prongs of the Class of 1 analysis, both the conceivable rational basis and the similarly situated requirement. Because until you've identified what the discriminatory conduct is, you don't really have a basis, a firm foundation for deciding whether the distinctions that are being drawn justify the difference in treatment. And that's why it's relevant respects, and that's why that issue is really generally should be an issue for the jury because you need some factual finding as to what you're talking about. So to take this case and to answer your question more directly perhaps, it's our contention that there was a rigged process culminating in a sham vote where Potawatomi was systematically disadvantaged throughout the process. And a large part of that discriminatory conduct involved filtering out information that tended to put Potawatomi in a stronger light relative to its competitors. Are you suggesting that in looking at similarly situated, we should not be looking at the proposals that were submitted? I'm saying that actually is the wrong framing, yes. So if we are not looking at the proposals that were submitted, what do you think we should look at for the similarly situated?  So if you take what our allegation is, which you have this process-based discrimination, so from the get-go of this process through the culmination, basically it's going to be, and I will concede this, in some respects a relatively low threshold. You have a qualifying proposal, you have an admittedly qualified candidate that made its way through the entire process. Let me give a counterexample to try to put some concreteness on this. This is not a case where Potawatomi was weeded out at some earlier stage of the process where the city said, you know what, you're not a credible candidate, we're not moving you on to the next round, they made it to the end round. Some of the information that was selectively withheld from the city council in this case went to the very issue of the qualifications of the applicants. So there's no rational basis for distinguishing between these applicants in the way the city did. So are you saying for the similarly situated analysis we look at the applicants and not their applications for the casino proposal? I think for the similarly situated in relevant respects, you start with what's the alleged discrimination? And you say here, were there differences among the applicants and their proposals, but let me qualify that, in kind of a threshold way that justified treating them differently in the way the city did. And at this point the discrimination starts from a very threshold, you know, the threshold of the selection process. So for example, Potawatomi has a very strong balance sheet. That information doesn't make its way into the consultant's analysis, doesn't make its way to the city council. There is information that is very critical about the proposals the city council is ostensibly voting on. Here's a specific example from the record, and I don't want to get too far into the weeds here. But North Point, which we say was really the favored candidate here, they submitted something to the mayor's administration that says, look, we're concerned when we get to the gaming board level, we're going to have to bid for that license once you hand it off. And so, and we're concerned that other applicants could outbid us. And we've tried to be very generous to the city. So if you certify multiple applicants, our proposal is going to be, will match the least generous financial consideration to the city, including as to the consideration to be paid for the land, the share with the city, et cetera. There's no rational basis based on the different qualifications of the applicants or their proposals from withholding that information from the city. So in this case, once you identify the discriminatory conduct, what you're really looking at is do you have qualified applicants who are participating in this process, who have submitted a concededly qualifying proposal, who are concededly well qualified, they made it to the end stage. The city is filtering out information before there's any consideration of proposals. So the differences in the proposals really are kind of beside the point when you look at the discriminatory conduct. I understand the argument. What's the best evidence, though, that this was rigged, that the stack was, you know, the deck was stacked?  Manipulated? That this was really, Mr. Bond had all of this on puppet strings? So, Judge. You know, that's the contention. Yeah. And I could go on for a while about this. Let me hit some high points. And I want to, and I'm not saying this to not answer your question, but I want to make clear about something. Some of this evidence will go to motive. Some of it goes to irrationality. And I want to be clear. Our position is, first you need to demonstrate irrational conduct and then motive. But let me give you an example. What you have here is a process playing out that is reacting to public scrutiny. So here's, this evidence was actually really strong. And when you read the district court's opinion, I urged the panel, and I know you will, to dig into the record a little bit and the statement of the case in our briefs and the summary judgment record. Because I think, because the district court started off with the wrong framing, you mostly get our theory of a rigged case jammed into a footnote, too, that in fairness doesn't read the facts in the light most favorable time. Presents our theory fairly crudely. Let me give you an example. Part of our theory here is that the mayor intended to favor Michael Bond, who's the principal of this North Point. Okay? And what happened was at some point there was public scrutiny because there was a lawsuit, because a reporter started snooping around and asking questions. We actually got the reporter's email in the discovery. Okay? Up to that point, now every municipality that's done this, everyone realizes they're not equipped to evaluate casinos. They have outside consultants. Chicago has outside consultants, Rockford, whatever. The city wasn't doing this with an outside consultant. The mayor put together a casino review committee. As his point person on that committee, and this is in the record, he put a mayoral aide who had been introduced to him by Bond because that mayoral aide had been an aide to Bond when he was a state senator and had been an employee of Bond's video gaming company. Okay? Then there's scrutiny. There's an outside consultant brought in. And all along the way, anytime there's information that tends to favor potawatomi relative to applicants or put other applicants in an unfavorable light, that gets manipulated. So the fact that, for example, Full House doesn't include job projections. They get invited to patch that up. There are all sorts of things about their financials that don't end up in the consultant's report. You guys weren't able to supplement from the plus or minus percentage thing? What the consultant said was, I can't factor that into my analysis. Okay? And it's against the rules to provide any supplementation. And so we didn't consider any supplemental information. That's just one example here. But it left the city council with the impression that somehow potawatomi was trying to violate the rules. It also left them with the impression that they hadn't taken supplemental information from other applicants. That's different treatment. The city council didn't know, had no idea that Northpointe had conditioned its proposal on being the sole selection. So they're voting on a proposal that's totally illusory. Doesn't your theory fizzle, though, given that Northpointe didn't get the casino? No, absolutely not, Judge, because our theory, and this is where I think, you know, respectfully, the district court portrayed our theory a little too crudely. Okay? The discrimination was an effort to limit competition for Northpointe. And no one knows, you know, Northpointe did get passed along to the gaming board. No one knows what the gaming board's going to do. And one thing, if you look in the summary judgment record, again, there's a consistent concern about the ability to bid for the license at the gaming board level. And our allegation is not just that there was, you know, bond whispered in the mayor's ear, who whispered in the city council's ear and said, this is how you're going to vote. Our theory is bond was the guy, Northpointe was the proposal, and then there starts to be public scrutiny. And so the mayor knows, I mean, look, this is not happening in a vacuum. It becomes clear he can't just, the city can't just certify Northpointe. And part of our narrative here that's well supported by the summary judgment record is that relative to Pottawatomie, Full House has weaker financials, has a bank reference letter that's nothing. It's balance sheet insolvent for the previous three years. None of that makes its way through into the consultant's report. And so our theory of the case is actually what the mayor and the bond-backed city council members were inclined to do. Once it became clear you can't just certify one, is to limit competition for their favored candidate, which ended up being the discriminatory conduct against us. The fact that, you know. So I come back to what I asked you earlier. Why isn't the similarly situated analysis then done on your submission and the submission of the four companies that were attempting to get the casino? Because the discriminatory conduct doesn't relate to just the consideration of proposals and isn't justified by the consideration of proposals. It's not what triggers it. It begins well before then. And in fact, our whole theory of the case is that the consideration of proposals was corrupted by the way information was siphoned to the city council. So, you know, that's why when you get back to it, you've really got to identify what the discriminatory conduct is. Let me give an illustration that I think kind of highlights the problem here with the way the district court approached it. And I think Judge St. Eve hopefully goes to the point you're getting at here. Take a municipal solicitation for some sort of public project, a solicitation for proposals, and assume that there's going to be, you know, some discretionary choices to be made, whatever the project is. It's not, you know, a solicitation for rebar or something like that, okay? And assume that for some illegitimate reason, an agency official wants to favor one competitor over a disfavored competitor. And one way to do that, and this is, you know, well-known in the bidding world, is to provide nonpublic information to the favored competitor, to the disadvantage of the disfavored competitor. And suppose the favored competitor wins. Under the district court's analysis, the defendant's going to be entitled to summary judgment. Because you can look at the proposals and the selection of proposals in isolation, there's going to be conceivable rational basis. But it completely misses the point. And to just look at, and by the way, this matters both for the rational basis and the similar re-situated requirement. So I had wanted to save some time for rebuttal. I realize I'm- Yeah, we'll give you a minute on rebuttal. Okay, I appreciate that. Yep, you're quite welcome. Okay, Mr. Insler, good morning. Good morning. May it please the court, Charles Insler on behalf of the city of Keegan. The Potawatomi are a disappointed applicant. They are not the victims of intentional discrimination. And the reasons for this lawsuit are transparent. Their own casino expert, John Reba, calculated that a casino in Waukegan was going to cost the Potawatomi's flagship casino in Milwaukee $32 million a year. One of their consultants also said that killing gaming expansion was the long-time Potawatomi position. And their own CFO said that putting a casino in Waukegan was going to be a high-risk venture with difficulty in financing and profitability. So the Potawatomi are not here on a genuine basis. They always wanted to kill a casino in Waukegan to benefit their flagship casino in Milwaukee. Now, Judge St. Evie asked about what is the comparator here. And the comparators are the proposals. The city of Waukegan was voting on proposals, casino proposals. They were not voting on a process. And so you need to look at what proposals each applicant put forward. And those proposals are in no way similarly situated. This court's decision in Paramount Media said when you have two offers for land property, one is a lump sum of $800,000 and the other is an offer for $1.14 million spread over 40 years. Just those two differences mean that the two applicants are not similarly situated. And in this case, we have a litany of reasons in which the proposals were different, the candidates are not similarly situated. And I think the Crosby case from the First Circuit with the Justice Souter opinion is particularly telling because in that opinion, they say, just given the absolute breadth of discretion when you're choosing casino applicants, it's almost impossible to have proposals that are similarly situated. And the facts bear that out in this case. You're talking about proposals that differed in square footage, design, architecture, the number of gaming positions, aesthetic, hotel, entertainment complex, temporary casino. And all of those are very important factors and points. So let's take square footage. The Potawatomi's proposal was 130,000 square foot for a casino. It was bigger than the next largest proposal by 55,000 square feet, full house. And yet John Repa, the Potawatomi's expert, said the Waukegan market is a, pejoratively, it's a grinder market, it's a meat and potatoes market. So what would you be doing putting a casino of that magnitude in Waukegan? It didn't make any sense. Now, some of the other proposals included hotels and entertainment complexes. The Potawatomi's did not. They did not have a temporary casino. They did not offer an entertainment complex. And they did not offer a hotel. Let's look at the importance of a temporary casino because right now, there's no casino. There's no permanent casino in Waukegan. All we have is a temporary casino. But that temporary casino is generating millions of dollars in revenue, $4.5 million in revenue this year based on the Illinois Gaming Board reports. That is millions of dollars going to Waukegan. And under the Potawatomi's proposal, there would have been no temporary casino. And so the city would have lost out on that million of dollars of tax revenue. So that's another important factor and another important difference. And Alderman Bolton said, that's an important difference to me. So these are not just conceivable reasons but actually well-supported reasons from the record. There's, you know, someone situated hurdle. And there's also the hurdle that we have to, this court has to find that there's no conceivable rational basis for treating the proposals differently. And the district court laid out six distinct reasons for treating the proposals differently. And those are both supported by the record and absolutely conceivable. And they don't negate, they don't negative any of those six reasons. What they want to do is they want to put the animus before the rational reasons. And they can't do that under the law. The Seventh Circuit has consistently said, we are not going to get to animus. We're not going to get to motivation until you can negate every one of the conceivable rational basis for the difference in treatment. And in the court cases where we do find no rational basis, those are cases that involve ministerial duties where there's absolutely no discretion involved. So we see in Brunson where the mayor hires a hitman basically to rough up the plaintiff's liquor license. In Brunson, there was no discretion. The mayor had to approve these liquor license renewals and he did not. In town of Cicero, it was involving condominium redevelopments. The plaintiff was not getting his building inspections. Even though he was passing all of the permitting requirements. And in Frederickson, the sex offender was trying to move from one town to another. And the city was not forwarding the leads files. And the witnesses in the Frederickson case said, we've never seen this. In 19 years of doing this, we've never seen this happen. And so when you have absolutely ministerial functions where there's no discretion, that's when you can say, look, there's animus. But where you have a casino application process where there's conceivable rational basis for choosing between different candidates, where there's a breadth of discretion, then you don't get to motivation. But I think it is worth touching on motivation because that's the case, right? Now, there are cases, it's illogical, right? If the fix was in, if the city of Waukegan always wanted to have Northpointe and Michael Bond be the lead applicant, then why on earth would you choose two competitors? That doesn't make any sense. And obviously, Northpointe wasn't even chosen. And, you know, it wasn't that this ProPublica article came out and so there's all this news coverage. In the early 2000s, the city of Waukegan had advanced one candidate to the Illinois Gaming Board. And the Illinois Gaming Board did its due diligence and found that it was not a suitable candidate. And so the city of Waukegan had put itself out there with one applicant and had regretted that decision. And so it was very well mentioned and very well noted that this time around, the city of Waukegan was not going to advance just one applicant. They were not going to put all their eggs in one basket. And so it's not the ProPublica article. This was a longstanding position, having been burned once before, that the city of Waukegan said we're going to advance more than one applicant as a hedge. That's what happened. The Johnson Consulting reports, you know, they sought clarifications. They wanted to make an apples-to-apples comparison of all the proposals for the benefit of the city council. So they were not permitting supplementation. That's the difference. That's the major distinction. And ultimately the Potawatomi were allowed to say, look. But they did it. They did permit supplementation in at least one instance, right? No, there were clarifications. The supplementation that the Potawatomi sought with this plus or minus 15 percent of the appraised value, that information did go to the city. It did come before the city council. But in the formal Johnson Consulting report, Potawatomi's number was the plus or minus 15 percent of the appraised value, which was a $5.6 million appraisal. And then with respect to the North Point offer, in his deposition Robert Long said he did not forward the North Point proposal because he thought North Point was seeking an unfair advantage. And so his motivation was equity, but not discrimination, not differential treatment. And Malcolm Chester, the Potawatomi's consultant, said the reason we lost was because the city council was not well informed on the proposals. He made no mention of Michael Bond and no mention of discrimination. That's their own expert, their own consultant. You know, in FKFJ this court said you can have a tapestry of colorful facts, you can have a complex situation, but it doesn't mean you have intentional discrimination. And this same court, FKFJ, says, you know, an absence of perfection in the process also does not mean you have intentional discrimination. So this was a complex process under extreme time conditions. And the city council members said they did the best they could under the circumstances. And to a person, each council member in their deposition said, I voted independently. Nobody told me how to vote. Mr. Insler, can I just ask you one question about the 1983 point? Yes, Your Honor. Just to kind of understand the position in your brief. Is it your position that in 100 percent of the cases, an Indian tribe or an affiliate, an arm of the tribe, has no rights under the Equal Protection Clause? I think for the purposes of the 1983 claim, we know that a sovereign cannot sue to vindicate a sovereign right. And so the question is, I guess the question is twofold, really. Would the pot of law be vindicating a non-sovereign right, and do they get to do that? And I think if you look at their own brief in Thurman, which is pretty telling, they say the tribes do not qualify. Forget the facts of this case, though. So I think you're right, no pun intended there, to focus on the right that is being sued for. But that seems to be a distinct question from whether the plaintiff is a person within the meaning of the statute. So your question is whether a sovereign is a person within the meaning of the statute? No, no, no. They're two different questions. The right that's being vindicated or sought to be vindicated in a 1983 action is a distinct question from whether the putative plaintiff is a person within the meaning of the statute. So suppose, for example, that you had a fictional city. I'm not talking about anything here. A fictional city that refused a proposal from a tribe on the basis of the tribe's religious practices or on the basis that the tribe had a male or female chief or something like that. The right that would be at issue would be equal protection. And to say that does not seem to answer the question of whether the tribe is a person or not. I think our position is that the Potawatomi or a sovereign nation cannot sue under Section 1983 because the meaning of the word person has to be given the same meaning both at the beginning and the end of that sentence. And so that's the position that the Fourth Circuit should remind all. Yeah, that's the symmetry point. Correct. That's our position. OK. All right. I want to briefly point out that just this year in Hammond redevelopment, this court said, affirmed a motion to dismiss where the city said we had a rational basis for an eminent domain proceeding despite allegations of punishing political rivals. Which are the exact allegations we have here. And that was at the motion to dismiss stage. Before we had, you know, 20 depositions in this case where every city council member was deposed and said on the record we were not discriminating against the city of Potawatomi. So in Hammond redevelopment just from this year, it was enough on a motion to dismiss to say we can find one, and it was only one, one conceivable rational basis for the taking at issue. And this case gets dismissed because this is not a viable class of one case. Unless the panel has any other questions, I'll conclude. OK. Not hearing any. Mr. Insler, thank you very much. I really appreciate it.  OK. Mr. Smith, we'll round that up to a minute for you. Thanks, Judge. I'll try to get two quick points in the minute. First, as I said, we understand there has to be evidence of irrational discrimination first, and then you get to motive. And that's what Hammond development said. You don't get to kind of look under the hood and say, well, I know there was a legitimate, seemingly legitimate basis for this government decision, but, you know, you can look into the heart of this official and, you know, he doesn't like the cut of my chip. We've got that here. But you don't get to that if there's a conceivable rational basis. That's what Hammond said. Right. And what there is no conceivable rational basis for here. And again, rational basis is shorthand for a legitimate, you know, rationally related to a legitimate government interest. The evidence here is very strong that the city selectively funneled information to the ostensible decision maker about these proposals. And what counsel said respectfully is that best and matter to be decided at trial. And I would refer the panel to paragraphs 48 and 49 of the statement of additional facts that Pottawatomie filed on summary judgment if you want to see. One remarkable piece of evidence we had was kind of a raw spreadsheet that the outside consultant had prepared, collecting everything that the mayor saw, and you can compare that to what ends up in the consultant's report. There was not just clarification. Okay. Full House had no job protections in their proposal. That was ostensibly a central part of this request for proposals. The city said, hey, could you guys fill that in? And that's my last point. This is not a summary judgment case. Okay. The more you dig into the record, we have a coherent theory about why there were multiple applicants certified, and we have evidence to back that up. Those rationales that the city council members gave about why they voted as they did, that wasn't contemporaneous. That was in their deposition testimony, and please don't just look at the defendant's statement of facts. Look at our response to that. And the fact that there was a triable issue about whether those city council members testified falsely about why they voted as they did is indeed a window into motive and indeed a window into the irrationality of this. You know, sometimes as a plaintiff's lawyer, you plead a case in good faith, you get the discovery, you kind of have to squint to see it. We just kept getting good stuff in this case. So I urge the court to dig into the record. Okay. Mr. Smith, thanks to you. Mr. Rensler, I appreciate your advocacy as well. We'll take the appeal under advisement. Thank you.